UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT L. KING,

              Plaintiff,

v.

LIEUTENANT STACH, et al.,

              Defendants.

Case No. 2:16-cv-01420-JCC-BAT

**REPORT AND RECOMMENDATION**

Whatcom County employees Lieutenant Stach, Sgt. Otten, Sgt. Fair, and Deputy Reid (hereafter "Defendants") move for summary judgment dismissal of Plaintiff Robert L. King's claims pursuant to Fed. R. Civ. P. 56. Dkt. 37. Mr. King filed a 28 U.S.C. § 1983 prisoner civil rights complaint alleging violation of the First Amendment (religious exercise and retaliation), the Religious Land Use and Institutionalized Persons Act (RLUIPA), and Fourteenth Amendment (due process). All of Mr. King's claims stem from his 22 day placement in a safety/ observation cell in the Whatcom County Jail (the "Jail"). Dkt. 15. At the time he was housed in the safety/observation cell, Mr. King had been convicted and sentenced in Whatcom County Superior Court and was therefore, no longer a pretrial detainee. Dkt. 46, Exhibits A and B.

Mr. King's response to the motion for summary judgment is not signed. Dkt. 43. As this is an oversight that is easily remedied, and because Mr. King proceeds pro se, the Court has

REPORT AND RECOMMENDATION - 1

considered the response.  In addition, the Court considered the allegations contained in the Amended Complaint and a Declaration of Facts attached to Mr. King's summary judgment response, which appears to have been signed under penalty of perjury by Mr. King on June 6, 2016.  Dkt. 43-2 at 38-39.

Based on the parties' filings, summary judgment evidence, and balance of the record, the undersigned recommends that Defendants' motion for summary judgment (Dkt. 37) be granted.

**FACTS**

Mr. King declares that on June 27, 2015, he was taken from his cell at gunpoint by Whatcom County deputies and questioned about threats or plans to harm staff and the existence of a weapon in his cell.  Dkt. 43-2, Declaration of Facts, at 38.  Mr. King maintains that even though he made no threats and had no knowledge of any weapon, Defendants punished him by placing him in a "drunk tank" [1] for 22 days.  *Id.*  Mr. King alleges this action was racially motivated and in retaliation because he had filed a federal civil complaint in Case No. C15-0804-MJP.  *Id.*

Defendants' records reflect that on June 27, 2015, Mr. King's cell was searched after another inmate reported that Mr. King had hidden a shaving razor in his cell and was planning on using it to take a hostage.  Dkt. 38, Declaration of Daniel Otten, Corrections Deputy, at ¶¶ 1-3; Dkt. 39, Stach Decl., Exhibit A at 15 (letter from inmate); Dkt. 43-1 at 27.  After receiving the letter, Defendant Otten, Lieutenant Stach, and Sgt. Fair decided to search all cells located in the E-Block, where Mr. King was then housed.  *Id.* at ¶ 4.  In the search of Mr. King's cell, Deputy Kaur found the razor blade, concealed in a bar of soap.  Deputies also found six pills, identified

---

[1] Inmates sometimes refer to the Jail's safety/observation cells as the "drunk tank" because they are often used to monitor intoxicated arrestees or inmates requiring medical assistance.  Dkt. 39, Stach Decl., ¶ 6.

REPORT AND RECOMMENDATION - 2

by medical staff as three days-worth of Mr. King's psychiatric mediation, and a modified toothbrush to which the razor blade could be attached to create a handled-weapon. *Id.* ¶ 5. Mr. King received an infraction for contraband possession, medication misuse, and weapons possession/manufacture. Dkt. 39, Declaration of Ernie Stach, Exhibit C, at 69-70.

After the search, Sgt. Otten advised Mr. King that he would be removed from general population, re-housed in an isolation cell on the third floor, and denied access to personal property. Dkt. 38, Otten Decl., at ¶ 6. Mr. King accused Sgt. Otten of placing the razor in his cell and then stated that he was going to kill himself. When asked if he had anything to say about the razor blade, Mr. King stepped back from his cell window, took off his shirt, and said, "I already said what I want to say. I'm going to kill myself." *Id*. When Sgt. Otten and Deputy Dhaliwal asked Mr. King to clarify whether his threats to kill himself were sincere, Mr. King refused to confirm that he was not in fact suicidal. Dkt. 38, Otten Decl., at 7. Mr. King then began to make threats, including "Wait till you see what I do next," "I'll go on a hunger strike," "Anyone comes in here, I'll break their jaw," and "I'm willing to die for this." *Id.* ¶ 8.

Based on Mr. King's statements, the decision was made to place him in Cell 126, one of the Jail's two safety/observation cells located on the first floor of the Jail. Dkt. 38, Otten Decl., ¶ 9. In response to his continued threats to harm himself, he was put in the WRAP restraint device to ensure he would not harm himself and was placed on 15 minute (suicide) checks. *Id.* ¶ 10. According to Sgt. Otten, Mr. King's placement in a safety/observation cell was not a punishment or sanction, but was based on Mr. King's statements and Whatcom County Jail policy, which dictates that an inmate exhibiting suicidal ideations or intentions should be placed in a safety/observation cell for monitoring. Dkt. 38, Otten Decl., at ¶ 11 and Exhibit B. According to Mr. King, he never threatened to commit suicide, was never interviewed by mental health staff,

REPORT AND RECOMMENDATION - 3

and was kept in the safety/observation cell solely as punishment. Dkt. 43-2, King Decl., at 38.

Corrections Lieutenant Ernie Stach, who is responsible for overseeing the day-to-day operations of the Jail, has an office on the first floor of the Jail just a few feet away from the Jail's two safety/observation cells (Cells 126 and 127), which allow close observation of inmates experiencing medical or behavioral issues.[2] Dkt. 39, Stach Decl., ¶ 1. According to Lt. Stach, the cells are approximately 7 feet and 4 inches 10 feet and 1 inch, have walls of rubberized material to prevent an inmate from harming himself, a light fixture, a smoke alarm on the ceiling, an air vent on the wall, and a drain grate in the middle of the floor. The cells have one door with a window, which looks out to the booking area. *Id.*, ¶ 6. Inmates are given a sleeping mattress and blanket and the cells are cleaned by inmate workers as needed. *Id.*

Mr. King describes the safety/observation cell as having urine, feces, and blood on the floors, walls and ceiling. He says he had no access to water to wash his hands before meals and had only a hole in the floor to use as a toilet. Dkt. 43-2 at 38-39. He claims he had to urinate and defecate in the corner and wait for hours and sometimes days, until the cell was cleaned. *Id.* at 39.

According to Lt. Stach, jail staff regularly checked on Mr. King approximately every fifteen minutes for the first four hours after he was placed in the safety/observation cell. Dkt. 39, Stach Decl., ¶ 7 and Exhibit B at 1.[3] *See also* Dkt. 43 (Plaintiff's Response), Exhibit A (Inmate Observation Checklist), which confirms the initial 15-minute checks. Two hours later the

---

[2] Mr. King was housed in either Cell 126 or Cell 127 at various times. As the cells, also referred to by Mr. King as the "drunk tank", are identical and used for the same purpose, they are referred to collectively as the "safety/observation cell." *See e.g.*, Dkt 39, Exhibit B at 28-30 ("moved to 127", "moved to shower room cell being cleaned" "back in 126").

[3] Citations to pages within Defendants' exhibits are to original page numbers contained on the lower left-hand corner of the pages.

REPORT AND RECOMMENDATION - 4

1  WRAP restraint device was removed and for the remainder of his time in a safety/observation
2  cell, Mr. King was regularly checked every 30 minutes. *Id.*, Exhibit B at 2-38. Mr. King
3  declares that no further suicide precautions were taken after the suicide restraint was removed.
4  Dkt. 43-2, at 38.

5  Mr. King alleges that he was never served with a disciplinary report and was never given
6  a hearing or other opportunity to object to the allegations, which he claims led to his detention in
7  a safety/observation cell. Dkt. 43-2, at 39. According to Lt. Stach, Mr. King received no
8  sanction or punishment as a result of the June 27, 2015, infraction for the razor blade and
9  medications found in Mr. King's cell. Dkt. 39, Stach Decl., ¶ 9. Mr. King received full credit
10 for the time he was held in the Jail in addition to all of his 67 days of "good time" accrued at the
11 Jail against his Department of Corrections ("DOC") commitment. *Id.*, Exhibit D. Lt. Stach also
12 confirms that Mr. King did not lose privileges of any sort as a result of the June 27, 2015,
13 incident and he was not housed in third-floor isolation, both of which are standard disciplinary
14 sanctions for the type of weapons infraction received by Mr. King. *Id.*, ¶ 9.

15 There was no hearing held on Mr. King's infractions. Classification Deputy Morres
16 indicated in Mr. King's records that no hearings were held regarding the infractions pending
17 psychiatric release of Mr. King to attend a hearing, and that Mr. King was thereafter released to
18 DOC custody before a hearing could be held. Dkt. 39, Stach Decl., ¶ 10, Exhibit A at 3 and 7.
19 Lt. Stach explains that this comports with Jail practice where an inmate commits infractions but
20 sanctions are not sought or imposed due to the inmate's mental health status and the overall goal
21 of stabilizing the inmate, especially in cases where the inmate is pending transfer to DOC
22 custody. *Id.*, at ¶ 10.

23

Mr. King remained in a safety/observation cell for twelve days. During this time, he continued to exhibit threatening and self-harming behavior, including vomiting and defecating in his cell, and refusing to eat or having difficulty keeping food down. He was followed closely by medical and mental health staff on these issues. Dkt. 39, Stach Decl., Exhibit E. Mr. King's continued placement in a safety/observation cell and subsequent housing assignments were thereafter controlled by and required the approval of medical and/or mental health staff. *Id.*, Exhibit F. On July 9, 2015, Mr. King was moved to Cell 129, after mental health staff determined on July 4, 2015, that he could be re-housed "per Sergeant's discretion." Dkt. 39, Exhibit F at 2. Lt. Stach describes Cell 129 as having a sink, toilet and bunk. Dkt. 39 at ¶ 11. However, on July 10, 2015, mental health staff instructed Mr. King should be moved back to a safety/observation cell and observed closely by mental health to protect against self-harm as he was exhibiting evidence of a psychotic break. Dkt. 39, Stach Decl., ¶ 12; Exhibit A at 12; Exhibit B at 27-28; Exhibit E at 7; and Exhibit F at 3).

On July 14, 2015, Mr. King had another episode involving self-harm (swallowing metal shavings and placing metal object in rectum) requiring a trip to the hospital for x-rays and medical care. Dkt. 39, Stach Decl., ¶ 13; Exhibit A at 14-18; Exhibit B at 32-33; Exhibit E at 10; Exhibit G. Mr. King was released back to the Jail that same day upon the physician's medical clearance. *Id.*, Exhibit G.

On July 15, 2015, mental health staff again cleared Mr. King for release from the safety/observation cell. Dkt. 39, Stach Decl., ¶ 14; Exhibit F at 6. On July 17, 2015, Mr. King was moved down the corridor to Cell 129, where he was held for the remainder of his time in the Jail. The DOC took custody of Mr. King on July 20, 2015. *Id.*

Jail records reflect that Mr. King did not submit any kites or file a grievance related to the claims set forth in his amended complaint, although he was aware that the Jail has a grievance system and he was given the Inmate Orientation Handbook containing the Jail's grievance procedure on January 13, 2015. Dkt. 39, Stach Decl., ¶¶ 15-16; Exhibit J.  Mr. King was also aware of the Jail's grievance program as he filed a grievance in April 2015 relating to a medical issue, which was reviewed and addressed. *Id.*, Exhibit H.  He also kited his public defender on June 22, 2015. *Id.*, Exhibit I.

While Mr. King was housed in the safety/observation cells, he would not have had access to writing implements. Dkt. 47, Second Declaration of Ernie Stach, ¶ 3.  However, he could have dictated a kite or grievance to a guard. *Id.*  Mr. King spoke to Lt. Stach numerous times during the time he was in the observation cell as Lt. Stach's office is just a few steps from the door of the observation cell. Dkt. 15 (Complaint) at 5.  Also, during the time Mr. King was housed in Cell 129 (July 9-20, 2015 and July 17-20, 2015), he would have had access to writing implements and paper. *Id.* at ¶ 4.

Mr. King declares Islam to be his religious faith and alleges he was unable to practice his faith by praying five times each day due to the conditions in the drunk tank (*i.e.,* "urine, feces, and human blood all over floors, walls and ceiling. Drunk tank has no sink, bunk, toilet or running water."). He alleges that he complained but was told by Sgt. Fair that he would "be better off praying to Jesus that way you won't have to kneel on the floor." Dkt. 15 at 5; Dkt. 43-2, at 38-39.

Mr. King never requested accommodation based on his religion (i.e., halal meat diet, prayer, a Quoran, special hygiene (wearing of a beard), or religious name change) during the time he was incarcerated at the Jail.  He made no requests to engage in religious practices while

1 he was housed in a safety/observation cell or at any time prior to June 27, 2015.  Lt. Stach states

2 that being housed in a safety/observation cell would not have impeded Mr. King's ability to pray.

3 Dkt. 39, Stach Decl., ¶ 15.8.

### STANDARD OF REVIEW

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp*., 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

### DISCUSSION

**A.   Exhaustion**

The Prison Litigation Reform Act ("PLRA") of 1995 provides:

REPORT AND RECOMMENDATION - 8

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). Exhaustion is a mandatory prerequisite to filing suit in federal court. *Id.* The exhaustion requirement applies to any suit, brought under any federal statute, regarding conditions of imprisonment, including "all prisoners seeking redress for prison circumstances and occurrences . . . whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.*; *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (same). Congress intended the PLRA to apply to all federal laws with respect to prisoner suits, with the intent that prison officials would have the first opportunity to address prison conditions. *Porter*, 534 U.S. at 524-25. Exhaustion "cannot be waived, even when the process is futile or inadequate." *Keal v. Washington*, Case No. C05-5737 RJB, 2006 WL 2222337 at *3 (W.D. Wash., Aug. 2, 2006); *see also Porter*, 534 U.S. at 524 (exhaustion is mandatory).

Jail records reflect that Mr. King did not submit any kites or file any grievances related to his claims in this lawsuit although he was aware that the Jail has a grievance system and he had received the Jail's written grievance procedure. Dkt. 39, Stach Decl., ¶¶ 15-16; Exhibit J. Mr. King was also aware of the Jail's grievance program as he filed a grievance in April 2015 relating to a medical issue, which was reviewed and addressed. *Id.*, Exhibit H. He also kited his public defender on June 22, 2015. *Id.*, Exhibit I.

Mr. King does not dispute that he failed to exhaust his administrative remedies. Rather, he speculates that because defendants take the position that he was placed in a safety/observation cell for suicide prevention, they cannot now argue that he failed to exhaust because suicide

REPORT AND RECOMMENDATION - 9

prevention "does not allow for individual to have things as pencil, pen or other things that could cause harm." Dkt. 43 at 6.  Lt. Stach confirms that Mr. King would not have had access to writing implements while housed in a safety/observation cell but Mr. King could have requested the assistance of the guards in preparing a grievance.  Lt. Stach states that oral grievances and kites are often received and addressed by facility staff in this manner.  Dkt. 47, Second Stach Decl., ¶ 3.  Mr. King interacted with Lt. Stach on numerous occasions as the safety/observation cells are only feet away from Lt. Stach's office.  *Id.*, ¶ 1; Dkt. 15 (Complaint) at 5.  In addition to Lt. Stach, Mr. King interacted daily with individuals both in and outside of the Jail, *i.e.,* his attorney (Dkt. 43 at 35; 43-1 at 7); medical and mental healthcare providers (Dkt. 43 at 11, 13, 14, 16, 17, 22, 26, 29, 31, 35, 36, 38; Dkt. 43-1 at 5, 6); jail guards (Dkt. 43 and 43-1 (generally)).  Moreover, Mr. King would have had access to writing implements on July 9-10, 2015 and July 17-20, 2015 while he was housed in Cell 129.  *Id.*, ¶ 4.

There is no evidence that Mr. King ever attempted, either orally or in writing, to file a grievance regarding his claims at any time during his incarceration at the Jail.  There is also no evidence that Jail officials purposefully thwarted any attempt to file a grievance.  As Mr. King has failed to set forth specific facts showing the existence of a genuine issue regarding his failure to exhaust administrative remedies, summary judgment may be granted on this basis and Mr. King's claims dismissed without prejudice for failure to exhaust.

Alternatively, the Court may grant summary dismissal of Mr. King's claims with prejudice because, as explained herein, he has failed to show Defendants violated his constitutional rights.

**B.     Due Process**

Mr. King alleges violation of his due process rights under the Fourteenth Amendment

REPORT AND RECOMMENDATION - 10

because Defendants failed to provide him with notice and a hearing so that he could dispute the allegations leading to his placement in a safety/observation cell. However, because Mr. King was a convicted prisoner at the time he was placed in a safety/observation cell, his claim is evaluated under the Eighth Amendment. *Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1312, *as amended on denial of reh'g*, 75 F.3d 448 (9th Cir. 1995) ("the convicted inmates' challenge is evaluated under the Eighth Amendment, and the pretrial detainees' challenge is evaluated under the Fourteenth Amendment") (citing *Redman v. County of San Diego,* 942 F.2d 1435, 2440 (9th Cir.) (en banc) *cert. denied*, 502 U.S. 1074 (1991).

Mr. King argues he was entitled to procedural due process (notice and hearing) because it is clear he was being punished for the razor found in his cell. He contends that his placement in a safety/observation cell was not for safety reasons because he was never suicidal and never claimed that he would commit suicide. He also contends that if he was really under suicide watch, Defendants violated their own rules by failing of have him evaluated by medical or mental health staff within 24 hours of his placement and observing his movements every fifteen minutes. Dkt. 43 at 3. With regard to these latter claims, the written evidence attached to Mr. King's response reflects that he was, in fact, evaluated by mental healthcare providers within 24 hours of his placement in the observation cell, two days later, and again three days later. (Dkt. 43 at 13, 17, 19 and 26). Mr. King was also checked every 15 minutes while he was classified a suicide risk (Dkt. 43 at 11) before he was switched to behavior checks every 30 minutes (Dkt. 43 at 12).

The Due Process clause provides prisoners two separate sources of protection against unconstitutional state disciplinary actions. First, a prisoner may challenge a disciplinary action which deprives or restrains a state-created liberty interest in some "unexpected manner." *Sandin*

REPORT AND RECOMMENDATION - 11

*v. Conner*, 515 U.S. 472, 483–84 (1995).  Second, failing the existence of a protected liberty interest, a prisoner may challenge a state action which nonetheless imposes some "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484; *Keenan v. Hall*, 83 F.3d 1083, 1088 (9th Cir.1996).  If the hardship is sufficiently significant, then the court must determine whether the procedures used to deprive that liberty satisfied Due Process.  *Sandin*, 515 U.S. at 484; *Keenan*, 83 F.3d at 1089.

There is no evidence of loss of a liberty interest because Mr. King was never disciplined or sanctioned and he did not lose any of his good time credits as a result of the infraction he received after the search of his cell revealed a hidden razor, modified toothbrush, and hoard of psychotic medications.  Therefore, the first source of protection under the Due Process clause is not available here.

As to the second source of protection under the Due Process Clause, there is no single standard for determining whether a prison hardship is atypical and significant, and the "condition or combination of conditions or factors ... requires case by case, fact by fact consideration." *Keenan*, 83 F.3d at 1089.  Three guideposts cited in *Sandin* provide a helpful framework: 1) whether the challenged condition "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence. *Sandin*, 515 U.S. at 486–87.  ; *Keenan*, 83 F.3d at 1089.

As previously noted, Mr. King was placed in a safety/observation cell instead of an isolation cell on the third floor, his placement did not affect the duration of his sentence, and the purpose of his placement was to keep him safe.  In addition, Mr. King provides no evidence that

his placement in the observation cell imposed an atypical and significant hardship warranting additional due process protections.  In his response (in relation to his First Amendment and RLUIPA claims), Mr. King contends that the "drunk tank" was "covered in urine, feces, and human blood" and smelled of a septic tank.  Dkt. 43 at 4.  However, and as is noted below with regard to his religious freedom claims, the record does not support Mr. King's description of his cell.  The "Inmate Observation Checklist," which is attached to Mr. King's response and the accuracy of which has not been disputed by Mr. King, reflects that Mr. King was regularly monitored by Jail staff, given a mattress and blankets, regularly provided drinking water, food, and mental health care, routinely offered showers and recreation opportunities, and that his cell was regularly cleaned.  *See* Dkt. 43 at 11-39 through Dkt. 43-1 at 1-11.

Mr. King was in the observation cell for twenty-two days and the "length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."  *Keenan,* 83 F.3d at 1089 (quoting *Hutto v. Finney,* 437 U.S. 678, 686 (1978)).  However, the undisputed record reflects that Mr. King's placement in a safety/observation cell was in direct response to his repeated threats to kill or harm himself and Jail policy, which dictates that an inmate who exhibits suicidal ideations or intentions be placed in a safety/observation cell for monitoring.  Dkt. 38, Otten Decl., at ¶¶ 6-11 and Exhibit B.  Thereafter, Mr. King was observed and regularly monitored by mental health staff and his release from the safety/observation cell was controlled by the professional judgment of mental health staff.  Dkt. 39, Stach Decl., Exhibits E and F.  And, although Mr. King insists that he never threatened suicide, notations made by medical and mental health providers reflect that Mr. King repeatedly exhibited threatening and self-harming behavior before and during his confinement in the safety/observation cell.  *Id.*, Exhibits E, F, and G.  Mr. King does not dispute the accuracy of his medical records or provide evidence to the

contrary. In fact, Mr. King's mental health providers released him from the safety/observation cell on two occasions, but after Mr. King exhibited disturbing behavior, determined that he should be transferred back for his own safety and further close monitoring. *See* Dkt. 39, Stach Decl., Exhibit A at 12; Exhibit B at 27-28; Exhibit E at 7; Exhibit F at 3. For example, on July 10, 2015 after Mr. King had been moved to Cell 128 after mental health personnel determined he was not demonstrating "overt self-harm acts that warrant ongoing safety cell," Mr. King was observed crouched in the cover near his cell door crying loudly and making "disassociating-type statements, such as '. . . he's gonna do it again … he's telling you, he's gonna kill . . .' repeatedly." *Id.*, Exhibit E at 7. And, just four days later, Mr. King was taken to the hospital after he appeared to swallow metal shavings and had secreted a small piece of metal in his rectum. *Id.*, Exhibit A at 14-18; Exhibit B at 32-33; Exhibit E at 10; Exhibit G).

Based on the foregoing, and viewing the summary judgment evidence in the light most favorable to Mr. King, the undersigned concludes that Mr. King's placement in a safety/observation cell was not disciplinary or punitive in nature. The duration of Mr. King's detention in a safety/observation cell was closely monitored and controlled by mental health personnel based on his behavior. Mr. King was not disciplined and his sentence was not affected by the infraction he received. There was no disciplinary action depriving or restraining a state-created liberty interest in some unexpected manner.

Moreover, there is no evidence that the conditions of his confinement in the safety/observation cells imposed an atypical and significant hardship on Mr. King. Mr. King was monitored on a regular basis, provided clean clothing, fed or a regular basis, provided a sleeping mattress and blankets, regularly provided drinking water, was given multiple opportunities to shower and recreate outside of the cell, provided medical and mental health care,

REPORT AND RECOMMENDATION - 14

and his cell was regularly cleaned. Accordingly, it is recommended that Defendants' motion for summary judgment on Mr. King's due process claim be granted.

**C.     Retaliation**

"A prisoner suing prison officials under 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir.1994) (per curiam) (citing *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir.1985)).  These claims must be evaluated in the light of the deference that must be accorded to prison officials.  *See Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995). The prisoner must establish a link between the exercise of constitutional rights and the allegedly retaliatory action.  *Id*.  Finally, the prisoner must demonstrate that his first amendment rights were actually chilled by the alleged retaliatory action.  *See Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000).

In his amended complaint, Mr. King states that he declared in his tort claim that his placement into the "drunk tank" was "an act of intimidation and retaliation."  In his Declaration of Facts, Mr. King states that the actions of "Whatcom county [were] racially motivated and retaliation do [sic] to claimant filing of federal civil complaint Case No. C15-0804-MJP."  Dkt. 43-2 at 38.  There are no other facts to support a claim of retaliation.

To properly state a retaliation claim, Mr. King must not only identify the constitutional activity in which he was engaged, he must also name the individuals who took retaliatory action, describe what retaliatory action each individual took, explain why the action did not advance legitimate penological goals, and describe how his First Amendment rights were actually chilled by the retaliatory action.

Mr. King provides no factual basis or evidence to support his bare contention that his placement in the "drunk tank" was retaliatory. Accordingly, it is recommended that Defendants are entitled to dismissal of the retaliation claim.

**D.     First Amendment and RLUIPA**

To satisfy a First Amendment religious claim, a plaintiff "must show the [defendant] burdened the practice of [his] religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir.1997) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). "In order to reach the level of a constitutional violation, the interference with one's practice of religion must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Freeman*, 125 F.3d at 737 (citing *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir.1987)).

The Religious Land Use and Institutionalized Persons Act (RLUIPA) provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1)  is in furtherance of a compelling governmental interest; and
>
> (2)  is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Under RLUIPA, plaintiff "bears the initial burden of going forward with evidence to demonstrate a *prima facie* claim that the challenged state action constitutes a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir.2005) (citing *Cutter v. Wilkinson*, 544 U.S. 709 (2005)). "[A] burden is substantial under

REPORT AND RECOMMENDATION - 16

RLUIPA when the state denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008) (internal quotes omitted). A prison's "accommodation of religious observances" should not be elevated "over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722. On the contrary, "an accommodation must be measured so that it does not override other significant interests." *Id*. Furthermore, "prison security is a compelling state interest, and ... deference is due to institutional officials' expertise in this area." *Id*. at 2124 n. 13.

Mr. King has failed to state a claim under either the First Amendment or RLUIPA. According to Mr. King, he is Muslim, his faith requires him to pray five times daily, the filthy conditions of the drunk tank made praying impossible, he told Sgt. Fair that he wanted to pray but couldn't because of the conditions in the drunk tank, and Sgt. Fair's response was that Mr. King should pray to Jesus so he would not have to bow down. Dkt. 43-2 at 38-39; Dkt. 15 at 5.

According to Jail records, Mr. King never requested accommodation based on his religion (i.e., halal meat diet, prayer, a Quoran, special hygiene (wearing of a beard), or religious name change) during the time he was incarcerated at the Jail, including the time he was housed in a safety/observation cell. Dkt. 39, Stach Decl., ¶ 17.

Accepting Mr. King is sincere in his stated religious beliefs, he has otherwise failed to provide evidence showing that any defendant unconstitutionally burdened his ability to practice his religion. *See e.g., Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002); *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir. 1978) (§ 1983 liability can only attach to a defendant personally involved in a constitutional deprivation). There is no evidence that any defendant, other than Sgt. Fair, was even aware of Mr. King's religion or that he claimed to be unable to perform his daily

REPORT AND RECOMMENDATION - 17

prayers. And assuming Sgt. Fair made the statement that Mr. King should pray to Jesus instead, the statement is regrettable but it is not proof that Sgt. Fair or any other defendant was keeping Mr. King from performing his prayers in the manner dictated by his faith. Mr. King claims that it was the condition of his cell, "covered in urine, feces, and human blood" and smelling of a septic tank combined with his inability to wash himself from head to toe, that "made it impossible for him to make Salat" (Muslim prayer) five times daily as required by Islamic belief. Dkt. 43 at 4. However, Mr. King's allegations are inconsistent with numerous notations of Jail employees on the "Inmate Observation Checklist," which Mr. King does not dispute. *See* Dkt. 43 at 11-39 through Dkt. 43-1 at 1-11. The checklist reflects that Mr. King was regularly taken out of his cell to shower (and refused several opportunities to take showers when they were offered), and that his cell was regularly cleaned (Dkt. 43 at 16, 18, 20, 22, 27, 29, 34, 36; 43-1 at 3, 9). The checklist also includes many observations of Mr. King sitting and laying down in his cell. He had a mat and was given blankets on request, which he could have used as a prayer mat and he was routinely provided with a jug of water for drinking and cleansing. Dkt. 43 at 12-39; Dkt. 43-1 at 1-10.

During the time he was housed in the safety/observation cells, Mr. King spoke to his attorney and was taken to court (Dkt. 43 at 35; 43-1 at 7), he was regularly visited by nurses and mental health staff in and out of his cell (Dkt. 43 at 11, 13, 14, 16, 17, 22, 26, 29, 31, 35, 36, 38; Dkt. 43-1 at 5, 6), he spoke with numerous Jail guards and was observed by Jail guards every 30 minutes (*see* Dkt. 43 and 43-1). Despite these interactions, there is no evidence that Mr. King complained of the condition of his cell or asked that it be cleaned.

Mr. King fails to allege facts or provide evidence from which the Court may reasonably infer that any of the defendants imposed a substantial burden on his ability to practice his

REPORT AND RECOMMENDATION - 18

religion. Therefore, it is recommended that Defendants' motion for summary judgment on his First Amendment Free Exercise and RLUIPA claims be granted.

**E.	Qualified Immunity**

The doctrine of qualified immunity will protect an officer from suit, even if he acted unconstitutionally, so long as a reasonable officer could have believed that his conduct was lawful. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a defense of qualified immunity, a plaintiff must establish that the defendant violated a constitutional right that was clearly established when the violation occurred. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled on other grounds). "Whether a right is 'clearly established' for purposes of qualified immunity is an inquiry that must be undertaken in light of the specific context of the case, not as a broad general proposition. In other words, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 846 (9th Cir. 2003) (internal quotation marks and citation omitted) (abrogated in part on other grounds).

The Court need not reach the issue of qualified immunity as there is no evidence that Defendants violated Mr. King's constitutional rights. *See e.g.*, *Saucier*, 533 U.S. at 201 (overruled on other grounds) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity").

## CONCLUSION

The Court recommends Defendants' motion for summary judgment (Dkt. 37) be **GRANTED** and all claims against Defendants Stach, Otten, Fair, and Reid be **DISMISSED with prejudice**. A proposed Order accompanies this Report and Recommendation. Any

objections to this Recommendation must be filed by **Friday, November 10, 2017**. The Clerk should note the matter for **Monday, November 13, 2017**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days after being served with the objections. A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served. The matter will then be ready for the Court's consideration on the date the response is due. Objections and responses shall not exceed 5 pages. The failure to timely object may affect the right to appeal.

The Clerk shall also provide a copy of this Report and Recommendation to the Honorable John C. Coughenour.

DATED this 19th day of October, 2017.

/s/ Brian A. Tsuchida
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATION - 20